UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA,      )
                               )
          v.                   )     CRIMINAL NO.
                               )     09-10028-DPW
LORRAINE HENDERSON,            )
                               )
          Defendant.           )

MEMORANDUM AND ORDER
April 25, 2012

In this criminal case the heedless, hapless, and negligent
hypocrisy of the defendant confronts the stern, solemn, and
implacable sanctimony of the government over a matter of
household employment: the periodic engagement of a cleaning lady.

Now before me is the question whether a jury verdict
supporting a felony conviction should stand in a case where an
unmarried professional woman - with supervisory responsibility
for the government in enforcing immigration laws - employed a
person she came to learn was an illegal alien to clean her home
from time to time and, when asked, advised the cleaning lady
generally about immigration law practices and consequences.  The
question is framed by the defendant's renewed motion for a
judgment of acquittal and, in the alternative, by her motion for
a new trial.

The cleaning lady's employment was not itself illegal under
regulations promulgated by the Attorney General of the United
States.  And the empathetic advice that the defendant gave her

-1-

cleaning lady about immigration law practices – induced from the defendant as part of the script contrived for an elaborate undercover investigation involving surreptitious electronic recordings into her relationship with the cleaning lady – did not advise the cleaning lady to engage in fraud or commit some other crime.

Yet Customs and Border Protection administrative rules prohibit CBP personnel like the defendant from employing an illegal alien, sanctioning such conduct on a spectrum from a fourteen day suspension to removal. And, more menacingly, a federal criminal statute carrying a five year maximum incarcerative sentence makes it a felony to "encourage or induce" an illegal alien "to reside" in this country.

The defendant's employment of an illegal alien as an intermittent cleaning lady in her home coupled with the immigration advice she gave her was considered sufficient by an earlier administration of the United States Attorney's Office to mount this felony prosecution. The Office determined to exercise its considerable discretion, despite the fact that the parallel misdemeanor provision treats even more significant conduct as *de minimis* and consequently not meriting criminal sanction, to initiate this unusual prosecution under a felony statute designed to address conduct so serious that it provides a predicate for application of the blunderbuss Racketeering Influenced and Corrupt Organizations ("RICO") statute, 18 U.S.C. § 1961 et seq.

The current administration of the United States Attorney's Office appears content to permit the case to continue, presumably as consistent with the previous administration's earlier choice to pursue the prosecution in the first place.

I view the pursuit of this case to have been overkill through the improvident invocation of federal criminal felony process when alternative administrative sanctions more closely tailored to the significance of the misconduct are available and adequate.  And I am puzzled by the dogged consistency[1] which causes this prosecution to continue. However, my responsibilities at this point are limited to determining whether the federal criminal law can permit such a prosecution and, if so, how a fair trial of such a prosecution may be managed.

After careful and extended review of the serious felony criminal statute the government invokes, I must conclude - under principles of statutory construction applicable to criminal provisions - that the government has the power to pursue such a prosecution.  However, I also must conclude - in light of case law developing in the federal appellate courts while I have had this matter under advisement - that my instructions to the jury as to the elements of the crime were inadequate, and that a new trial is warranted in which appropriate jury instructions

---

[1] *Cf.* Ralph Waldo Emerson, *Self Reliance* in Essays: First Series (1841), *reprinted in* Emerson: Essays and Lectures at 259, 265 (Library of Am. 1983).

fashioned in response to recent developments in the case law will be delivered.

In the larger scheme of criminal justice proceedings, it is for the government to make the decision whether further pursuing a prosecution like this is a fair, reasonable, and proportionate exercise of prosecutorial discretion under circumstances involving a matter of at most modest culpability.

## I.  FACTS

In order to demonstrate the pedestrian quality of the conduct that is at the core of this felony prosecution, I will recite at length the largely undisputed facts as the jury could have found them in returning a guilty verdict.

A.  Background

*1.  The Defendant Comes to Boston*

The defendant Lorraine Henderson graduated from Saint Raymond Academy for Girls, a Bronx parochial high school, on June 20, 1975.  The next week she started work as a clerk/typist for the former United States Customs Services.  By dint of hard work and native intelligence, Henderson, although not a college graduate, rose steadily through the ranks to analytical and management positions in Customs Services in the New York City area and then at headquarters in Washington, D.C.

Following the reorganization of the federal government's customs, border control, and immigration functions under the newly created Department of Homeland Security, Henderson was

appointed in December, 2003, after a competitive process, to be Boston Area Port Director for United States Customs and Border Protection, a position at the highest regular civil service rank. One of the other candidates she prevailed over in the competitive process was Nora Ehrlich. Ehrlich thereafter herself became Assistant Director of Field Operations for Trade and Cargo in Boston. Both Henderson and Ehrlich were among the six senior managers who reported directly to Donald Farquharson, the District Field Officer in Boston.

As Boston Area Port Director, Henderson was responsible for the international ports of entry by air and sea in Massachusetts, Connecticut, and Rhode Island, such as Logan Airport in Boston, the cargo terminals of Boston Harbor, Bradley Airport in Connecticut, and T.F. Green Airport in Rhode Island. In addition to customs responsibilities for which she had developed experience and expertise while working for the Customs Service, Henderson also assumed responsibility for identifying and placing into deportation illegal aliens found in the ports of entry she oversaw. The responsibilities under immigration law were new to Henderson, because she had risen in the Customs branch of Homeland Security.

2.   *The Defendant Finds Cleaning Services*

Upon her appointment as Boston Area Port Director, Henderson, who had never lived in the Boston area, bought a townhouse in a condominium complex in Salem. In March 2004,

Henderson found a cleaning lady, Fabiana Bitencourt, through a business card that was posted in her condominium complex.  She paid Bitencourt $75 for cleaning her townhouse roughly every two weeks.

When Ehrlich, who also lived in Salem, asked Henderson about what cleaning help she had, Henderson recommended Bitencourt; Ehrlich and her mother thereafter began using Bitencourt as their cleaning lady.

3.   *CBP Presses Standards*

Following its reorganization and consolidation with the Department of Homeland Security, CBP undertook an especially vigorous initiative to emphasize its mission and to demand its employees observe a high standard of professionalism.  As a result, Henderson received a number of advisories about the obligations of employee conduct, including agency directives that it was misconduct to "knowingly and inappropriately associate with . . . illegal aliens" including any "off-duty . . . business relationship," as phrased in the 2004 CBP "Table of Offenses and Penalties."  Henderson, in her role as a supervisor, also gave other employees training on these advisories.

4.   *Ehrlich Identifies Bitencourt as an Illegal Alien*

As part of the ongoing training CBP provided regarding employee obligations, all CBP employees in December 2005 received specific cautionary advice from CBP headquarters that they should

not employ illegal aliens in the home.  Shortly thereafter,
Ehrlich inquired of Bitencourt whether she was a legal resident
of the United States.  When Bitencourt said that she was residing
in the United States illegally after having paid to be led across
the border from Mexico, Ehrlich terminated her employment.
Ehrlich thereafter reported to another CBP supervisor the
relationship she had terminated with Bitencourt, informed the
supervisor that Henderson had a similar relationship with
Bitencourt, and reported that she intended to inform Henderson
that Bitencourt was an illegal alien.  A month or two later,
Ehrlich told Henderson that she had terminated Bitencourt, but
Henderson chose to ignore the implications of Ehrlich's report
and deflected the conversation without indicating what, if any,
action she would herself take.

　　　*5.  Henderson's Career Prospects Further Develop*

　　　Henderson's career continued to advance in CBP and she was
offered a detail during 2008 to work in Los Angeles.  This
temporary assignment was seen by Henderson and others in the
agency as a precursor to her appointment to the Senior Executive
Service, a supergrade status at the top of the non-political
positions in federal government employment.  One day, while
riding home to Salem with Ehrlich before moving temporarily to
Los Angeles, Henderson told Ehrlich she would be suspending
cleaning services at her condo.  Henderson said that Bitencourt's
friends had been doing cleaning for her recently while Bitencourt

suspended work to have a child, and stated (incorrectly) that having a child in the United States made Bitencourt a legal resident.[2]  Ehrlich did not pursue the matter further with Henderson, who thereafter was on a work detail in Los Angeles from mid-February until early July 2008.

    *6.  Ehrlich Prompts an Investigation*

    Ehrlich did not mention the matter again to any CBP supervisor until she was in a March 19, 2008 meeting with Farquharson, the District Field Director in Boston.  During the meeting, Farquharson discussed Henderson's potential for advancement as a result of the Los Angeles detail.  Ehrlich then told Farquharson that Henderson continued to employ an illegal alien despite Ehrlich's advice.  Farquharson shortly thereafter initiated an internal agency investigation of Henderson's relationship with Bitencourt.  That investigation blossomed into undercover use of electronic surveillance by Bitencourt, whose cooperation was easily secured after her vulnerabilities to

---

    [2]  Henderson's lack of familiarity with immigration law apparently caused her to get the principle of birth citizenship backwards.  A child born in the United States immediately becomes a United States citizen on birth, *see* U.S. CONST. amend. XIV, § 1 ("All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside."), but her alien parent(s) would not. *See generally Papakonstantinou* v. *Civiletti,* 496 F. Supp. 105, 109 (E.D.N.Y. 1980) (observing that immediate relatives, such as parents, of a child who has become a citizen at birth are not entitled to special procedures to adjust their alien status on that basis until the child reaches the age of twenty-one).

deportation were made clear to her.  She has been authorized to remain in the United States to participate in the undercover investigation and subsequent prosecution of Henderson.

    7.   *Henderson Resumes Employing Bitencourt*

When Henderson returned from her assignment in Los Angeles, she again asked Bitencourt to clean her condo periodically. Henderson paid Bitencourt in cash and left instructions after each cleaning session requesting her return in roughly two weeks. In addition, Henderson told Bitencourt that she had provided Bitencourt's number to her neighbor Angelo, who had told Henderson he also wanted Bitencourt to clean his house but had lost her number.

Henderson was generally not home when Bitencourt cleaned, and for the most part they communicated by phone and by notes left at the condo.  But Henderson was home on September 8, 2008 when Bitencourt arrived to clean.  During a surreptitiously recorded conversation that day, Bitencourt noted Henderson's government vehicle and asked whether Henderson could help her "to be good . . . legal."  Henderson purported to express surprise and asked "you have a U.S. baby though, right?"  After Bitencourt confirmed that she did, Henderson told her "you have to put in paperwork and file" and warned "you have to be careful 'cause they will deport you."

In further conversation, Bitencourt told Henderson that she was Brazilian, had come into the country seven years prior without a visa, had never left, and wanted to stay in the United

States.  Henderson cautioned her "if you leave they won't let you back."  Repeatedly telling Bitencourt, "you can't leave, don't leave," Henderson said "once you leave you will never be back." Henderson then told Bitencourt to "let me find out and see . . . what you can do."  Henderson then paid Bitencourt and told her to return in two weeks.

     *8.  Henderson Seeks Expert Advice*

     The next day, Henderson consulted with her subordinate, Cynthia Sutton, who had immigration expertise and responsibilities in the Boston CBP organization.  Henderson asked for Sutton's advice, telling Sutton that she had a cleaning lady she believed was an illegal alien.  Sutton gave Henderson a list of questions to ask Bitencourt to clarify the relevant factual background and her prospects for adjusting her status.

     When Bitencourt returned to clean Henderson's home on September 23, she found that Henderson had left $80 in payment for the cleaning services and a note that asked a number of the questions Sutton had suggested, including whether Bitencourt had entered the United States legally or illegally, where she had entered the country, whether she had been convicted of a crime, and whether she had any legal alien relatives in the United States.  The note also asked her to return to clean again. Bitencourt responded to the note in writing that she was illegally in the United States, had paid a man to bring her across the border from Mexico to California, had never been

convicted of a crime, and had no legal alien relatives in the
United States. She also wrote that she would return to clean on
October 21.

After receiving Bitencourt's responses to Sutton's suggested
questions, Henderson returned to talk with Sutton. Sutton told
Henderson that the cleaning lady was illegal with no meaningful
prospect of adjusting her status and that Henderson should
terminate the relationship with her.

*9.   Henderson Continues Employing Bitencourt*

When Bitencourt returned again to clean on October 21, she
found $80 in cash together with a note providing some suggested
dates for future cleaning and the promise that "I will call you
back about the other question." Bitencourt wrote her own note in
response saying "I am a little worried about this problem I have,
I will wait for your call."

Bitencourt called Henderson's telephone number on November
4, 2008 and left a message that because of car trouble she would
not be able to clean that day, but was available November 12.
Bitencourt went to Henderson's home on November 12 but found
neither money nor a note; she did, however, find a business card
for another cleaning service on the kitchen counter.

*10.   Henderson is Arrested, Tried, and Found Guilty*

Henderson was arrested at her home on December 5, waived her
Miranda rights, and was transported to be booked and held in the
United States Marshals' lockup in the Boston federal courthouse

until she was arraigned before a United States Magistrate Judge. Henderson was released on an unsecured appearance bond of $25,000, the government not having moved for her detention. A grand jury thereafter indicted Henderson on one count of violating 8 U.S.C. § 1324(a)(1) by encouraging or inducing an illegal alien to reside in the United States.

Henderson was tried before a jury in a six-day trial. During deliberations, the jury asked for further instruction regarding what "encouraging" and "inducing" meant. After receiving the supplemental instructions, the jury found Henderson guilty.

B.  Pending Motions

Henderson timely renewed a motion for judgment of acquittal under Federal Rule of Criminal Procedure 29 (Dkt. No. 60), and filed a motion for a new trial under Federal Rule of Criminal Procedure 33 (Dkt. No. 62) after trial. I heard argument on the motions, together with the parties' respective sentencing recommendations, and chose to defer sentencing while I took resolution of the outstanding motions under advisement.

## II.  ADMINISTRATIVE SANCTIONS

The government offered as evidence to prove the defendant's knowledge and intent of the impropriety of employing an illegal alien a CBP advisory entitled "Table of Offenses and Penalties." Among the offenses identified was one for "[k]nowingly and inappropriately associat[ing] with . . . illegal aliens" including in "off-duty . . . business relationships." Not only

does that advisory provide evidence of knowledge and intent, it also provides guidelines for CBP managers or supervisors "in assessing the appropriate penalties for common types of misconduct."

To be sure, the existence of an administrative regime of sanctions does not foreclose parallel criminal sanctions. *See, e.g.*, *Helvering v. Mitchell*, 303 U.S. 391, 399 (1938) (noting that although double jeopardy bars multiple punishments, the government can choose between civil and criminal proceedings if both are available); *Iran Air v. Kugelman*, 996 F.2d 1253, 1258 (D.C. Cir. 1993) (R.B. Ginsburg, J.) ("It is not unusual for Congress to provide for both criminal and administrative penalties in the same statute . . . ."); Jason M. Day, Comment, *The Intertwining of Administrative Actions and the Criminal Justice System*, 4 TEX. TECH. J. TEX. ADMIN. L. 99 (2003) (discussing Texas law allowing for administrative sanctions for the traditional crime of theft of gasoline). Nevertheless, to put in context the degree of seriousness with which the misconduct at issue in this case is viewed by the affected agency, it bears noting the recommended guideline sanction for a first offense such as that committed by Henderson.

The guideline sets the proportionate sanction for "[k]nowingly and inappropriately associating with sources of information, illegal aliens or persons connected with illegal

activity/[o]n or off-duty/[i]nclud[ing] any social, sexual, financial (including acceptance of gifts), or business relationship" as a range between a "14-day suspension to removal."  Employing an illegal alien who may lawfully be employed by non-CBP personnel would appear to be somewhere in the mid-range of the misconduct covered by potential sanctions.

The Table advises that while "progressive discipline is appropriate for most types of infractions, some (such as accepting a bribe) are so egregious that a single instance is sufficient to warrant removal."  The Table identifies removal as the only recommended penalty for a first offense of accepting or agreeing to accept or soliciting a bribe, and specifically cross-references the criminal bribery statute, 18 U.S.C. § 201. By contrast, no cross reference - to 8 U.S.C. § 1324(a)(1)(A)(iv) or any other criminal provision - was apparently thought relevant to the CBP offense of "inappropriately associating."

### III.  STATUTORY BACKGROUND

Looming over the administrative regime governing conduct by Department of Homeland Security employees like Henderson with immigration responsibilities are larger concerns regarding immigration policy of the United States.  That policy has been adjusted in various ways since the First Congress enacted the Naturalization Act of 1790.  *See generally,* ARISTEDE R. ZOLBERG, A NATION BY DESIGN: IMMIGRATION POLICY IN THE FASHIONING OF AMERICA (2006)

(providing the history of immigration policy in America).  Most
recently and fundamentally, the Immigration Reform and Control
Act of 1986 ("IRCA") made regulating the employment of illegal
aliens the crux of our nation's immigration control policy.

Two separate sections of the IRCA introduced new criminal
provisions that are relevant here: a misdemeanor codified as 8
U.S.C. § 1324a,[3] and the count of felony conviction in this case,
8 U.S.C. § 1324(a)(1)(A)(iv).[4]

The supplementary information to the final rulemaking issued
under the IRCA by the Department of Justice stated that "[s]ince
1972 numerous attempts ha[d] been made by Congress and recent
Administrations to pass immigration reform legislation.  The
imposition of sanctions on employers [were] a cental element of
nearly all such attempts with the view that curbing illegal
immigration would not be effective without such sanctions."

---

[3] Section 1324a provides that "[i]t is unlawful for a person
or other entity (A) to hire, or to recruit for a fee, for
employment in the United States an alien knowing the alien is an
unauthorized alien . . . with respect to such employment."  8
U.S.C. § 1324a(a)(1)(A) (1986).  For a violation of § 1324a only
civil penalties are available, unless the government demonstrates
that the defendant has a "pattern or practice" of violating the
statute, in which case a conviction may result in a fine and a
sentence of up to six months.  *See* 8 U.S.C. § 1324a(f)(1).

[4] Section 1324(a)(1)(A)(iv) provides that "[a]ny person
who . . . (iv) encourages or induces an alien to come to, enter,
or reside in the United States, knowing or in reckless disregard
of the fact that such coming to, entry, or residence is or will
be in violation of law [is guilty of a felony]."  8 U.S.C.
§ 1324(a)(1)(A)(iv)(1986).

Control of Employment of Aliens, 52 Fed. Reg. 16216 (May 1, 1987), 1987 WL 142272.  The IRCA was "designed to control the unlawful employment of aliens in the United States by imposing civil and criminal penalties on those persons and entities that hire, recruit or refer for a fee unauthorized aliens." *Id.* at *16217.

A.  <u>Regulation of Employment of Illegal Aliens by Civil Penalties on Employers</u>

Section 1324a, the misdemeanor statute, was adopted as § 101 of the IRCA, *see* Pub. L. No. 99-603, 100 Stat. 3359, 3360-74 (1986).  As expressed in the legislative history, the purpose of this aspect of the IRCA was to control illegal immigration by imposing "penalties for employers who knowingly hire undocumented aliens, thereby ending the magnet that lures them to this country."  H.R. REP. No. 99-682, pt. 1, at 45 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5649-50.

However, the IRCA also provided that the Attorney General could enact regulations creating exceptions to § 1324a.  8 U.S.C. § 1324a(h)(3).  This reflected a concern expressed by the House Committee that sanctions should not apply "in the case of casual hires," that is, "those that do not involve the existence of an employer/employee relationship."  H.R. REP. No. 99-682, pt. 1, at 57.  As discussed in Section IV.A below, the Attorney General promulgated regulations excepting "casual employment" like Bitencourt's work for Henderson, from § 1324a's scope.

B.  **Criminal Penalties for Encouraging or Inducing Aliens to Reside Illegally in the United States**

Section 112 of the IRCA, codified at 8 U.S.C. § 1324 and entitled "Unlawful Transportation of Aliens to the United States," created a felony sanction for any person who:

> *encourages or induces* an alien to come to, enter, or *reside* in the United States, *knowing or in reckless disregard* of the fact that such coming to, entry, or *residence will be in violation of law*.

8 U.S.C. § 1324(a)(1)(A)(iv) (emphases added).

The language of encouraging or inducing found in § 1324(a)(1)(A)(iv) originated in the Immigration Act of 1917. Pub. L. No. 64-301, 39 Stat. 874, 879-80.  Section 5 of the 1917 Act provided that it was unlawful "to induce, assist, encourage, or solicit . . . the importation or migration of any contract laborer or contract laborers into the United States." *Id.* at 879.  Similarly, Section 6 of the 1917 Act provided it was unlawful to "induce, assist, encourage, or solicit . . . any alien to come into the United States by promise of employment through advertisements . . . ." *Id*.

The offense of encouraging or inducing was refined in § 274(a)(4) of the Immigration and Nationality Act of 1952 (the "INA"), which provided, in relevant part, that any person who:

> willfully or knowingly encourages or induces, or attempts to encourage or induce, either directly or indirectly the *entry* into the United States of - any alien . . . not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States. . ., shall be guilty of a felony.

Pub. L. No. 82-414, 66 Stat. 163, 228 (emphasis added).  The INA,

like the 1917 Act, provided no definition of the terms "encourage or induce."

When consideration was given to amending § 274(a)(4) of the INA through what became the IRCA in 1986, the Justice Department urged Congress to retain the encouragement/inducement offense, which the Department argued had "proven to be a useful tool in combatting alien smuggling." *See* H.R. REP. No. 99-682, pt. 1, at 112.

Consistent with the government's position, the current version of § 274(a)(4) (codified at 8 U.S.C. § 1324(a)(i)(A)(iv)) contains the terms "encourages or induces" as part of the offense. Nevertheless, the terms remain undefined. An innovation introduced by the IRCA is that § 1324(a)(i)(A)(iv) now subjects to criminal penalties not only the encouragement or inducement of aliens to *enter* the United States, as did the INA, but also the encouragement and inducement of aliens to *reside* in the United States. *See* 8 U.S.C. § 1324(a)(1)(A)(iv).

## IV.  THE THEORY OF CRIMINAL LIABILITY

The government's theory of criminal liability in this case turns upon the contention that separately or together, Henderson's employment of, and advice to, Bitencourt were felonious. I will address the statutory language regarding employment in Section IV.A below and regarding advice in Section IV.B, before reviewing, in Section IV.C.1, the evolving case law that construes the statute of conviction. The review conducted

-18-

in Section IV.C.1 leads me to conclude, in Section IV.C.2, that
the defendant is not entitled to a judgment of acquittal in this
setting because there was sufficient evidence at trial from which
a reasonable juror could find Henderson violated
§ 1324(a)(1)(A)(iv) as properly construed.  Finally, in Section
IV.D.1 I analyze the jury instructions I gave in light of recent
developments in the case law, and conclude, in Section IV.D.2,
that a new trial is warranted to avoid a substantial miscarriage
of justice.

A.    <u>Employment of Illegal Aliens</u>

       It is the interplay between §§ 1324a and 1324 that frames
the problematic quality of this prosecution as a matter of
statutory construction.  The problem is that employment of an
illegal alien would appear to be a basis for felonious
encouragement or inducement to reside in the United States while
the same conduct involving Henderson's engagement of the cleaning
lady here could not give rise to a misdemeanor.

       In 1987, the Attorney General, through his delegee the
Commissioner of the Immigration and Naturalization Service, gave
substance to the regulatory exception carved out in
§ 1324a(a)(1)(h)(3) by issuing a rule defining employment to
exclude "casual employment by individuals who provide domestic
service in a private home that is sporadic, irregular or
intermittent."  8 C.F.R. § 274a.1(h).  Thus, engaging the
services of an illegal alien in such casual employment is not

itself in violation of the law because it is not defined as "employment" under the statute at all.

Even if such employment had not been carved out by the regulatory exception, the criminal sanction under § 1324a is set not at the felony but at the misdemeanor level, and even then that sanction may be imposed only for a "pattern or practice" of employing illegal aliens. 8 U.S.C. § 1324a(f). The government concedes that it could not prosecute Henderson for the misdemeanor created by § 1324a.[5]

A critical aspect of Henderson's motion for judgment of acquittal is that mere employment constitutes at most an exempted misdemeanor under 8 U.S.C. § 1324a, in contrast to the felony offense of encouraging and inducing under 8 U.S.C. § 1324(a)(1)(A)(iv), with which she was charged. To decide whether the felony penalty is appropriate, I must determine what effect, if any, § 1324a and its regulatory exception for casual employment have on § 1324(a), when the same conduct is involved and would not be punishable under § 1324a as a misdemeanor but would be punishable under § 1324(a) as a felony.

---

[5] The government, however, contends that Henderson's periodic engagement of Bitencourt was not "sporadic, irregular or intermittent." While I find as a matter of law that it was and that Henderson's engagement of Bitencourt falls within the safe harbor from prosecution under § 1324a provided by the Attorney General's regulation, the government concedes that other elements of § 1324a are independent grounds for finding Henderson did not violate that misdemeanor provision.

In considering this issue, I first examine the language of § 1324(a)(1)(A)(iv) because a court must always "begin[] with the language of the statute." *Simmons v. Galvin,* 575 F.3d 24, 58 (1st Cir. 2009) (quoting *Phillips v. Pembroke Real Estate, Inc.,* 459 F.3d 128, 139 (1st Cir. 2006)). The relevant language applies to "[a]ny person who . . . encourages or induces an alien to come to, enter, or reside in the United States, knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law." 8 U.S.C. § 1324(a)(1)(A)(iv). This subsection of the statute does not explicitly exclude employers from its scope.

Several courts have held that "[a]lthough § 1324 and § 1324a appear to cover some of the same conduct, 'the fact that Congress has enacted two sections encompassing similar conduct but prescribing different penalties does not compel a conclusion that one statute was meant to limit, repeal, or affect enforcement of the other.'" *United States v. Zheng,* 306 F.3d 1080, 1085 (11th Cir. 2002) (quoting *United States v. Kim*, 193 F.3d 567, 573 (2d Cir. 1999)); *Hager v. ABX Air, Inc.,* No. 07-cv-317, 2008 WL 819293, at *11 (S.D. Ohio Mar. 25, 2008) (same); *Brewer v. Salyer*, No. 06-01324, 2007 WL 1454276, at *5 (E.D. Cal. May 17, 2007) (same); *Hernandez v. Balakian*, 480 F. Supp. 2d 1198, 1206 (E.D. Cal. 2007) (same).

As the Supreme Court has held, two statutes which "overlap"

and express "partial redundancy" may still be "fully capable of coexisting." *United States v. Batchelder*, 442 U.S. 114, 118, 122 (1979). A statute cannot be repealed implicitly by another statute merely because "the two statutes produce differing results when applied to the same factual situation." *Id.* at 122 (quoting *Radzanower, v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976)). "Rather, the legislative intent to repeal must be manifest in the 'positive repugnancy between the provisions.'" *Id.* (quoting *United States v. Borden Co.*, 308 U.S. 188, 199 (1939)).

In addition, the evolution of the statutory provisions suggests that Congress intended to cover illegal alien workers, even if they are not engaged in "employment" pursuant to § 1324a. As discussed in Section III *supra*, both § 1324(a)(1)(A)(iv) and § 1324a were adopted as part of the IRCA, which was designed as a deterrent to illegal entry. The House Report for what became the IRCA stated:

> This legislation seeks to close the back door on illegal immigration so that the front door on legal immigration may remain open. The principal means of closing the back door, or curtailing future illegal immigration, is through employer sanctions. . . .
>
> Employment is the magnet that attracts aliens here illegally or, in the case of nonimmigrants, leads them to accept employment in violation of their status. Employers will be deterred by the penalties in this legislation from hiring unauthorized aliens and this, in turn, will deter aliens from entering illegally or violating their status in search of employment.

H.R. REP. No. 99-682, pt. 1, at 46.

In furtherance of this objective, the IRCA not only adopted § 1324a but also broadened the scope of § 1324(a).  As discussed in Section III.B *supra,* the previous version of this subsection enacted in 1952 only imposed criminal liability on a person who willfully or knowingly encouraged or induced "the *entry* into the United States of any alien."  Pub. L. No. 82-414, 66 Stat. at 228 (emphasis added).  The new version of § 1324(a)(1)(A)(iv) now subjects to criminal liability the act of encouragement or inducement of an alien to "*reside* in the United States" as well. 8 U.S.C. § 1324(a)(1)(A)(iv) (1986) (emphasis added).

Moreover, the IRCA expanded the scope of § 1324(a) related to harboring illegal aliens to reach employers.  Prior to the IRCA, § 1324(a) imposed criminal liability for any person who willfully or knowingly concealed, harbored, or shielded from detection an illegal alien, provided, however, that "employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring."  8 U.S.C. § 1324(a)(3) (1982).  In § 112(a) of the IRCA, Congress amended § 1324(a) to eliminate this employment exclusion, thereby allowing § 1324(a) to apply to employers.  Pub. L. No. 99-603, § 112(a), 100 Stat. 3359, 3381-82 (1986).  It is therefore clear that, by enacting the IRCA, "Congress obviously sought not only to deter employers from directly joining forces with those who

bring in illegal aliens but also to prevent employers from encouraging the practice by hiring aliens knowing that they had been brought in illegally." *Edwards v. Prime, Inc.*, 602 F.3d 1276, 1293 (11th Cir. 2010).

The fact that employers may or may not also be sanctioned under § 1324a does not exempt Henderson from liability under § 1324(a)(1)(A)(iv).  The rationale is that "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." *Kim,* 193 F.3d at 574 (quoting *Batchelder*, 442 U.S. at 123-24).  "[A] defendant has no constitutional right to elect which of two applicable federal statutes shall be the basis of his indictment and prosecution." *Id.*  When two statutory sections operate independently of one another, "there is no bar to the Government's proceeding with prosecution simultaneously under the two statutes." *Ball v. United States*, 470 U.S. 856, 860 (1985).

The plain and unadorned language of § 1324(a)(1)(A)(iv) can be read to cast a wide net over those who interact with illegal aliens by offering employment.  When I pressed the government with illustrative hypotheticals during arguments regarding the legal issues in this case both before and after the jury's verdict, the government reluctantly found itself compelled to take the position that conduct of the type in which Henderson

-24-

engaged, even when undertaken by a homemaker with no official immigration responsibilities, could still be dragged up into the felony prohibition of 8 U.S.C. § 1324(a)(1)(A)(iv).  Thus, the government took the position before me that any homemaker who intermittently engages an individual cleaning lady to clean the homemaker's residence, knowing the cleaning lady is an illegal alien, would be prosecutable as a federal felon.  The legal logic of the government's position is that such employment "encourages" or "induces" an illegal alien to reside in the country by providing an economic incentive to do so.  Even if plainly intermittent, payment for and the anticipated repetition of such excepted employment presents the prospect of future economic benefit to the illegal alien by residing in the United States. This is seen by the government as criminal encouragement or inducement under § 1324(a)(1)(A)(iv).

The obvious conclusion that this reading of § 1324(a)(1)(A)(iv) has the effect of nullifying the regulatory exception to § 1324a(h)(3)(B)- expressed in the Attorney General's definition of employment in 8 C.F.R. § 247a.1(h) – by swallowing it in § 1324(a)(1)(A)(iv) is troubling.  When pressed at oral argument, the government expressed an evident discomfort with the conclusion, and the only defense of its position that it could muster was that the government would never prosecute someone who was simply a homemaker.  Whether the government would

ever do so is a separate question from whether it can. Section 1324(a)(1)(A)(iv) can be read to permit the government to do so.

B.    Advice to Illegal Aliens

The government also takes the position that giving illegal aliens advice to remain in the United States while their status is disputed constitutes felonious conduct under § 1324(a)(1)(A)(iv) because it constitutes encouragement or inducement under the statute.  Here also, the hypotheticals I posed, to which the government reluctantly responded, illustrate the tension created by the reach of the government's position. In response to my questioning, the government contended that an immigration lawyer would be prosecutable for the federal felony created by § 1324(a)(1)(A)(iv) if he advised an illegal alien client to remain in the country because if the alien were to leave the alien could not return to seek adjustment of status.  The government at argument likened such advice to that of a criminal defense lawyer who advises a client regarding the prospective robbery of a bank.

The hypothetical, however, cannot be deflected by implicit reference to the crime/fraud exception to the attorney client privilege.  The bank robbery example involves giving advice on how to commit a crime at a future time.  The immigration lawyer, on the other hand, is involved in advising the client about how to pursue entirely legal processes in seeking to adjust her

status.  It is not a crime, except in some important

circumstances not relevant for present purposes, to be an illegal

alien present in the United States.  *See United States v.*

*Costello*, 666 F.3d 1040, 1047 (7th Cir. 2012) (noting that

"generally it is not a crime to be an illegal alien").[6]

Nevertheless, an unadorned plain meaning reading of the

words "encourages or induces" can lead to the conclusion that

advice about what an alien needs to do - including the need for

---

[6] The government has recently reaffirmed this position in briefing before the Supreme Court.  In its brief for a major immigration case argued in the Supreme Court today, the United States stated that:

> Unlawful presence is not a crime under the INA. Rather, an alien who is present in the United States without authorization may be placed in civil removal proceedings; ordered removed by an Immigration Judge, subject to administrative and judicial review; and removed.  But although many unlawfully present aliens are detained and ultimately removed, Congress has provided the Executive Branch with substantial discretion to pursue other courses—*e.g.*, to defer proceedings, grant relief from removal, or allow temporary release from custody.  When the Executive Branch stays its hand in that fashion to allow individual aliens to remain at liberty, it naturally may also refrain from prosecuting them for registration violations, even though the aliens are unlawfully present and not registered.

Brief for the United States at 32, *Arizona* v. *United States*, No. 11-182 (S. Ct. Mar. 2012) (citations omitted).

In this connection, it should be noted that the Government reports that Bitencourt has been permitted to continue residing in the United States in deferred status to permit her participation as a cooperating witness in this criminal proceeding (Dkt. No. 96).

an alien to remain in the United States - in order to seek to adjust the alien's status could support the conclusion that such advice is within the scope of § 1324(a)(1)(A)(iv)'s prohibition.

C.   Appellate Case Law and the Sufficiency of the Evidence

   1.   *The Developing Appellate Case Law*

   The government concedes that there has never before been a prosecution of an individual for giving advice about immigration procedures and consequences to a person - known to her to be an illegal alien - engaged in employment itself excepted from regulation under federal immigration law.  The case law under § 1324(a)(1)(A)(iv), which is not extensive and to which the First Circuit has apparently not yet been called upon to contribute, developed initially in circumstances where the manner and means of encouraging or inducing a known illegal alien to reside in the United States were independently improper.  It takes its cues from the case law regarding the earlier statutory prohibitions on encouraging illegal aliens to "come into" or "enter" the United States which has generally involved themes and variations on alien smuggling.[7]  Perhaps as a consequence, the

_____

   [7] The case law involving encouraging and inducing illegal aliens to "come to" or "enter" the United States is somewhat more extensive but it too invariably involves factual circumstances including independently improper means of encouraging or inducing aliens.  *See, e.g.*, *United States v. Tracy*, No. 10-cr-4676, 2011 WL 5966930, at *3 (4th Cir. Nov. 30, 2011) (affirming conviction for encouraging or inducing by fraudulently obtaining travel documents for illegal aliens and advising them to enter the U.S. indirectly).

language used in the cases to construe the statute has, until recently, reflexively expressed a broad reach because courts have not been required to consider carefully and in context encouragement or inducement that is not itself independently improper.

The Fourth Circuit, in what appears to be the first reported Court of Appeals decision on the encourage or induce to "reside" branch of § 1324(a)(1)(A)(iv), *United States v. Oloyede*, 982 F.2d 133 (4th Cir. 1992), confronted a scheme in which an immigration lawyer and a cab driver falsified citizenship application documents for illegal aliens. While observing broadly that "'encouraging' relates to actions taken to convince the illegal alien to . . . stay in this country," *id.* at 135, the court noted that the defendants' "actions reassured their clients that they could continue to work in the country, that they would not be subject to the threat of imminent detection and deportation, and that they could travel back to their homeland without risk of being prevented from returning, thus providing all of the benefits of citizenship." *Id*. at 137. Ultimately, the court held that it was "[t]he selling of fraudulent documents and immigration papers under these circumstances [that] constitutes 'encourages' as that word is used in the statute." *Id.*

More recently, the Eleventh Circuit canvassed the cases under § 1324(a)(1)(a)(iv), while considering an appeal over the

propriety of a motion to dismiss a civil RICO action. *Edwards* v.
*Prime, Inc.*, 602 F.3d 1276 (11th Cir. 2010). The court observed
that it had previously "given a broad interpretation to the
phrase 'encouraging or inducing'. . . construing it to include
the act of 'helping' aliens . . . remain in the United States,"
*id.* at 1295, and reversed the District Court for dismissing a
RICO claim under § 1324(a)(1)(A)(iv) where "the defendants had
knowingly supplied the aliens with jobs and with social security
numbers to facilitate their employment." *Id.* The court observed
that the case law had developed around the proposition that
illegal aliens would be encouraged or induced because "[t]heir
ability to find and keep jobs depends to a considerable extent on
improperly obtaining the necessary documentation." *Id.* at 1296.

The Third Circuit, however, has most recently taken issue
with the broad language in the law of other circuits regarding
the scope of § 1324(a)(1)(A)(iv). In a case on appeal before the
Third Circuit when the jury in this case returned its verdict,
and as to which the mandate issued just last month, *DelRio-Mocci
v. Connolly Properties, Inc.*, 672 F.3d 241 (3d Cir. 2012), the
plaintiff brought a civil RICO suit against the property managers
of his apartment building, claiming that they were engaged in a
scheme to seek out illegal aliens as tenants so the management
company could neglect repairs to the premises on the theory that
illegal aliens would not complain about the housing conditions.

The district court dismissed the complaint for failure, *inter alia*, to allege the predicate act of a violation of § 1324(a)(1)(A)(iv), and therefore failed to state a RICO conspiracy claim upon which relief could be granted.[8]  The Third Circuit affirmed on somewhat different grounds.

---

[8]  That § 1324(a)(1)(A)(iv) provides a predicate for a RICO conspiracy action is the result of the wholesale and indiscriminate incorporation of the immigration harboring prohibitions as RICO predicates under 18 U.S.C. § 1961.  The RICO statute was designed to target organized crime.  *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 248 (1989) ("The occasion for Congress' action was the perceived need to combat organized crime.").  Indeed, its very name - the Racketeer Influenced and Corrupt Organizations Act - gives some sense of the heartland of the RICO statute.  When the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (1996), undertook to add certain alien smuggling-related offenses under § 1324(a)(1)(A) as predicate offenses to the RICO statute, the legislative history made clear that Congress thought that it was only including smuggling organizations within RICO's scope.  *See* H.R. REP. No. 104-22, 1995 WL 56411, at *6 (1995) ("The bill adds a number of immigration-related offenses as predicate offenses . . . to enable [Federal law enforcement officials] to use the [RICO] statute to combat *alien smuggling organizations*." (emphasis added)).  Yet, as Chief Judge McKee observed in his concurrence in *DelRio-Mocci v. Connolly Properties, Inc.*, 672 F.3d 241, 251-53 (3d Cir. 2012) (McKee, C.J. concurring), the specification of the predicate offense as "<u>any act</u> which is indictable under the Immigration and Nationality Act, section 274," in 18 U.S.C. § 1961(1)(F) brought anything prosecutable under 8 U.S.C. § 1324(a)(1)(A)(iv) within RICO's scope.  The opinion of the court in *DelRio-Mocci* observed that "[w]e cannot imagine that Congress contemplated that our nation's landlords (not to mention our hotel and motel operators, innkeepers, and others who are in the business of providing accommodations) would be tasked with making complex legal determinations about who is permitted to live in this country, much less that they would be criminalized for an error in so doing." *Id.* at 250.  The same might be said about homemakers engaged in making choices concerning their cleaning help. The stakes for those choices become exponentially higher when the RICO statute is implicated.

The Third Circuit began by analyzing the scope of § 1324(a)(1)(A)(iv)'s prohibition against "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States." It held that "encouragement or inducement must also be 'substantial' to support a conviction under the statute. This means not just general advice . . . but some affirmative assistance that makes an alien lacking lawful immigration status more likely to enter or remain in the United States than she otherwise might have been." *Id.* at 248. Induce, the Third Circuit held, "plainly refers to conduct that causes someone to do something that they might otherwise not do." *Id.* Looking to dictionaries by Merriam-Webster and Black, the court noted that in the context of § 1324(a)(1)(A)(iv), "'encourage' . . . also refers to conduct that causes someone to do something that they otherwise might not do." *Id.* at 248-49.

The Third Circuit adopted this view of "encouraging" and "inducing" in part because a broader reading of subsection (iv) would otherwise swallow up the other subsections:

> Subsection (i) prohibits bringing an alien lacking lawful immigration status to the United States other than at a designated port of entry. Subsection (ii) prohibits transporting such an alien within the United States in furtherance of their illegal presence in this country. Finally, subsection (iii), which we have already discussed at length, prohibits harboring an alien not lawfully present. If we define "encourage" merely as "to help," then the particular conduct that is prohibited in subsections (i)-(iii) is subsumed by the general prohibition against helping an undocumented

person to "come to, enter, or reside in" the United
States in subsection (iv).

*Id.* at 249.  Noting that courts read statutes to avoid, if
possible, making any part superfluous, the Third Circuit read

> subsection (iv) as prohibiting a person from engaging
> in an affirmative act that substantially encourages or
> induces an alien lacking lawful immigration status to
> come to, enter, or reside in the United States *where
> the undocumented person otherwise might not have done
> so.* Thus, subsection (iv) has the distinct character of
> foreclosing the type of substantial assistance that
> will spur a person to commit a violation of immigration
> law *where they otherwise might not have*.

*Id.* (emphasis added).

The Third Circuit has, I think, developed the reading of the
statute most carefully tailored both to its plain language and
the canons of statutory construction.  That reading is applicable
to the circumstances of this case.

Circuits that earlier gave a broad reading to "encouraging
or inducing" were faced with defendants who were personally and
actively involved with bringing illegal aliens into the United
States.  *See, e.g.*, *Lopez*, 590 F.3d 1138, 1249-52 (11th Cir.
2002) (reading "encouraging or inducing" to be synonymous with
"helping," where Lopez captained a boat, picked up illegal
aliens, and navigated the boat to the United States); *United
States v. Fujii*, 301 F.3d 535, 540 (7th Cir. 2002) (holding that
"[t]o prove that Fujii 'encouraged or induced' the aliens, all
that the government needed to establish was that Fujii knowingly
helped or advised the aliens," where Fujii was flying with the

-33-

aliens to the United States).  Here, of course, Henderson was not
actively involved in bringing Bitencourt to the United States,
and it is unclear how the Fourth, Eleventh, and Seventh Circuits
would view Henderson's *de minimis* assistance under the "reside"
portion of § 1324(a)(1)(A)(iv) if directly confronted with such
factual circumstances.

The developing case law raises more broadly normative
concerns about what happens when the judge-made gloss on a
statute develops too quickly, with a consequent failure to
consider carefully how cases at or beyond the margins of the
statute's reach may be affected by language more broad than
necessary to decide the case under consideration.  *Cf.* Pierre N.
Leval, *Judging Under the Constitution: Dicta About Dicta*, 81
N.Y.U. L. Rᴇᴠ. 1249, 1255 (2006) (noting that courts are more
likely to be imprecise in dicta than in an opinion's holding).

When faced with new statutes, prosecutors often wisely
exercise their charging discretion to test the new statute only
with cases squarely in the heartland of the conduct Congress
plainly intended to deter and punish.  Once the core cases are
established to anchor the statute in Congress's intent,
prosecutors are free to advance their desired doctrine on the
basis of precedent containing dicta which may not have considered
the limits of the statute's heartland.  In this connection, if,
as the Seventh Circuit has written, "all the government need[s]

to establish is that [the] defendant knowingly helped or advised the alien," *Fujii*, 301 F.3d at 540, the statute may be deployed to criminalize any action, however modest, which may be construed to involve any help or advice, however innocent in itself, to illegal aliens.

The Third Circuit properly warned against such an overbroad reading of the statute. "[D]efining the conduct at issue in this case as encouraging or inducing runs the risk of criminalizing actions contemplated by federal law and undermining the federal system of immigration enforcement." *DelRio-Mocci*, 672 F.3d at 250.

### 2. *Sufficiency of the Evidence*

After trial, Henderson timely renewed her motion for judgment of acquittal. Under Federal Rule of Criminal Procedure 29, a judgment of acquittal may be entered "only if the evidence, viewed in the light most favorable to the government, could not have persuaded any trier of fact of the defendant['s] guilt beyond a reasonable doubt." *United States v. Mubayyid*, 658 F.3d 35, 47 (1st Cir. 2011). A trial judge "is not to weigh the evidence or assess the credibility of witnesses when [he] judges the merits of a motion for acquittal," *Burks v. United States*, 437 U.S. 1, 16 (1978), but must instead "take into account all evidence, both direct and circumstantial, and resolve evidentiary conflicts and credibility disputes in favor of the jury's

verdict." *United States v. Valerio*, --- F.3d ----, ----, 2012 WL
1292530, at *4 (1st Cir. Apr. 17, 2012).

Here, there appears to be sufficient evidence, albeit
barely, in the record that a jury could find, even adopting
(as I now do) the Third Circuit's interpretation of
§ 1324(a)(1)(A)(iv) that Henderson, knowing Bitencourt was an
illegal alien, encouraged or induced her to reside in the United
States when, otherwise, she might not have so resided.  The
government contends there were two ways in which Henderson
encouraged or induced Bitencourt to reside here: by employing her
directly and by giving her advice about immigration laws.  I
address each in turn.

With respect to employment, the government argued that the
economic incentive of employment encouraged or induced Bitencourt
to reside in the United States.  The government argued that
Henderson's payment for, and anticipated repetition of,
Bitencourt's cleaning services presented Bitencourt with the
prospect of future economic benefit, thus causing her to reside
here when she otherwise might not have.[9]

---

[9]  I note the Third Circuit has held that general advice to
an illegal alien to keep a low profile is insufficient to support
a conviction under § 1324(a)(1)(A)(iii), the separate subsection
of the statute at issue dealing with shielding, harboring, or
concealing an alien and designed to prevent aliens from remaining
in the United States.  *United States v. Ozcelik*, 527 F.3d 88 (3d
Cir. 2008).  The *Ozcelik* court observed that "we have found no
cases in which a defendant has been convicted under this statute
for merely giving an alien advice to lay low and to stay away

With respect to the information about immigration law that Henderson provided, the government argued that giving Bitencourt advice to remain in the United States while her status was disputed constituted encouragement or inducement to reside here because otherwise she might not have.

Straining to draw every possible inference in the light most favorable to the government, I conclude a jury could find that Henderson's employment together with her advice could have caused Bitencourt, or a person in her position, to reside here when she otherwise might not have. Bitencourt testified that, while upon arriving in the country she had worked at a variety of jobs, including as a cashier at Stop & Shop, in recent years she had only worked as a private house cleaner because the pay was substantially better. When asked whether she anticipated that every time she cleaned Henderson's house she would be asked to come clean again, Bitencourt said yes. Bitencourt also testified that if she did not have work, she would not stay in the United States, though her husband would if he could. And, on its face,

_____

from the address on file with the [immigration authorities], obvious information that any fugitive would know." *Id.* at 99. The court concluded that "[h]olding Ozcelik criminally responsible for passing along general information to an illegal alien would effectively write the word 'substantially' out of the test we have undertaken to apply." *Id.* at 101. These observations would appear equally applicable to the subsection (iv), the provision at issue here. The government contends the evidence in this case is sufficient because it involves neither mere employment nor mere advice alone, but both together.

Henderson's advice to Bitencourt that "you can't leave, don't leave" was directly intended to encourage and induce her to continue to reside in the United States, at least until her immigration status was resolved.  Considering these facts together, a jury could find that Henderson's continued employment of Bitencourt encouraged or induced her to reside in the United States when otherwise she might not have.

It goes without saying that the government did not have the benefit of the Third Circuit's opinion in *DelRio*, and thus did not know that it is required to prove that Henderson's employment or immigration advice was "substantial," in the sense that it amounted to "affirmative assistance that makes an alien lacking lawful immigration status more likely to enter or remain in the United States than she otherwise might have been." *DelRio-Mocci*, 672 F.3d at 248.  I will give the government some benefit of the doubt when considering whether its evidence meets a standard to which it did not know it would be held, and am reluctant to grant a motion for judgment of acquittal for failure to prove an element of a case that the government did not know it needed to prove in the manner which *DelRio-Mocci* requires.

However, while the government prevails at this point on Henderson's motion for judgment of acquittal, its prospects for success at a new trial do not appear promising.  Substantial evidence introduced at trial suggests that Henderson's employment

of and advice to Bitencourt would not make her or an illegal alien in her position "more likely to . . . remain in the United States than she otherwise might have been."  In 2004, Bitencourt had between ten and fifteen private house-cleaning clients.  At the time of trial, she still had between ten and fifteen clients, even without Henderson.  Bitencourt testified that when Henderson was in Los Angeles from February to July 2008 and Bitencourt was not cleaning her condo, Bitencourt did not struggle financially and continued working for her other clients.  Thus, if the loss of Henderson's business from February through July 2008 did not cause Bitencourt to leave the United States, it is unlikely that Henderson's intermittent use of Bitencourt as a cleaning lady when she returned from Los Angeles made Bitencourt more likely to remain in the United States than she already was.

As to Henderson's advice to Bitencourt constituting felonious encouragement or inducement to reside in the United States, Henderson only spoke to Bitencourt about her immigration status because law enforcement officers induced her to do so by having Bitencourt ask Henderson for immigration advice.  As Bitencourt testified, in seeking advice about her immigration status she was "following orders" by law enforcement personnel.  Thus, Henderson's advice, never before sought by the illegal alien, is unlikely to have made Bitencourt or an illegal alien in

her position more likely to reside in the United States than she already was.

## D.   Adequacy of Instructions and The Need for a New Trial

*1.   The Instructions as Given*

Like the government, I did not have the benefit of *DelRio-Mocci's* interpretation of § 1324a(1)(A)(iv) when I charged the jury at trial.  Relying upon the cases decided to date, I gave quite open textured instructions.  I gave the jury dictionary definitions of the operative terms "encourage" and "induce." Without objection by the parties, I left to the jury as the conscience of the community whether the definitions of the words "encourage" and "induce", which cover a broad spectrum, could fairly describe activity by Henderson which would justify imposition of a criminal sanction.  In this connection I told them:

> One of the great Federal Judges from Massachusetts, Oliver Wendell Holmes, said that, "A word is the skin of a living thought." And what you have are the words "encourage" and "induce," and you have to understand what it is that is throbbing within that skin, what is it that we can say, as a community, we are subjecting people to criminal sanction for if they encourage and induce under these circumstances.

I delivered the instructions, as I generally do in non-complex criminal cases, from notes, as opposed to reading from a written text, in order to permit me to observe carefully that the jury was following the thread of the directions I was giving them.  I am satisfied they were; although, when I emphasized the

concept of the jury's role as the conscience of the community in applying the definitions I gave them, I observed a number of knitted juror brows, as they absorbed the gravity of the task and the lack of tight and specific direction from the court.

It is apparent that the proper definition of the terms "encourage" and "induce" was a matter of some concern to the jurors because, about an hour and a half after beginning deliberations, they submitted a note requesting I provide the definitions in written form.  I did so, using the dictionary definitions I had given them orally, by returning their note with my written response developed after consultation with counsel and again without their objection to the final form of instruction delivered.  The verdict was returned about two and a half hours after the jury received my response to their note.

Under the circumstances, there is no question that the instructions at issue here were a matter of core concern to the jury in their deliberations.  And, in light of the interpretation of the charging statute recently provided by the Third Circuit in *DelRio-Mocci*, I am satisfied there is no question that those instructions were erroneous because they were too open textured and did not require the jury to find substantiality to any encouragement or inducement.

I am now of the view that a jury is not properly instructed under 8 U.S.C. § 1324(a)(1)(A)(iv) regarding the criminal

character of "encouragement" or "inducement" unless it is directed that it must find the acts it determines constitute encouragement and inducement also were "affirmative assistance that makes an alien lacking lawful immigration status more likely to enter or remain in the United States than she otherwise might have been." *DelRio-Mocci*, 672 F.3d at 248. There was thus a substantial defect in the jury instruction I gave without the benefit of *DelRio*. With proper instruction, the jury could readily have found that Bitencourt or an illegal alien in her position would have resided in the United States irrespective of Henderson's employment and advice, and that Henderson's employment or advice did not make it more likely that she would continue to reside in the United States.

2. *The Need for a New Trial*

Under Federal Rule of Criminal Procedure 33, I may vacate a judgment and grant a new trial "if the interest of justice so requires." Fed. R. Crim. P. 33(a). While the First Circuit has cautioned that "[t]he remedy of a new trial must be used sparingly, and only where a miscarriage of justice would otherwise result," *United States v. Conley*, 249 F.3d 38, 45 (1st Cir. 2001), I believe that this is such a case. *See United States v. Kamen*, 491 F. Supp. 2d 142, 153 (D. Mass. 2007) (granting a motion for a new trial and finding that the "failure to instruct the jury on a lesser included offense constituted a

'miscarriage of justice'").

The First Circuit has noted the importance of accurate jury instructions to the criminal justice process:

> The purpose of requiring instructions on the elements of an offense is to ensure that, if the jury convicts, it will be convicting a defendant for the crime with which he is charged. Even if the jury has the indictment before it or hears a rote recital of the statutory language, instructions may be required; after all, the language used in statutes may not be familiar to lay jurors, or common words may take on unaccustomed meanings in particular legal settings. The necessity for instruction, then, flows from the fundamental principle that the jury must understand what it is that it is sworn to do.

*United States v. Natanel*, 938 F.2d 302, 311-12 (1st Cir. 1991) (citations omitted). This is because "[t]he Constitution gives a criminal defendant the right to demand that a jury find him guilty of all the elements of the crime with which he is charged." *United States v. Gaudin*, 515 U.S. 506, 511 (1995).

It is within the sound discretion of a trial judge to grant a motion for new trial. *United States v. Soto-Alvarez*, 958 F.2d 473, 479 (1st Cir. 1992). And, of course, I retain the power to correct errors in my own jury instructions while the case remains under my jurisdiction. *See generally* 58 AM. JUR. 2D *New Trial* § 279 ("Despite the foregoing rules, where the trial court gives instructions without objection being made to them, it retains the power to correct errors in the instructions while the case is under its control. Thus, where a motion for a new trial is filed

which points out errors in the instructions, the court may set aside the verdict.").

Under the reading of § 1324(a)(1)(A)(iv) that I adopt, my instructions to the jury were erroneous.  I consider myself obligated in the careful exercise of my discretion to order a new trial to determine whether the government can make out the properly defined elements of the offense charged, specifically whether the government can prove beyond a reasonable doubt that Henderson's actions served to encourage or induce an illegal alien like Bitencourt to reside in the United States in violation of immigration laws when she might not have done so otherwise. Without proof on that element beyond a reasonable doubt, Henderson may not be convicted of a felony under 8 U.S.C. § 1324(a)(1)(A)(iv).

## V. CONCLUSION

When Robert H. Jackson served as Attorney General of the United States before becoming an Associate Justice of the Supreme Court, he began a speech to a conference of United States Attorneys with the accurate observation that "[t]he prosecutor has more control over life, liberty and reputation than any other person in America."  Robert H. Jackson, *The Federal Prosecutor*, 24 J. AM. JUDICATURE SOC. 18 (1940).  He noted further that "[w]ith the law books filled with a great assortment of crimes, a prosecutor stands a fair chance of finding at least a technical

violation of some act on the part of almost anyone." *Id.* at 19.
So it is here.

The government has in § 1324(a)(1)(A)(iv) a tool by which to
prosecute anyone who knowingly employs an illegal alien for
intermittent domestic work, even if that alien is engaged in
employment by terms exempt from sanction under immigration law.
Indeed, the government professes the statute is broad enough to
permit prosecutions of housewives for employing undocumented
aliens to clean their house periodically and immigration lawyers
for advising illegal aliens regarding the circumstances under
which they may pursue adjustment in status. To date it
understandably has not chosen to press the statute that far. But
in such a circumstance, Jackson said:

> the citizen's safety lies in the prosecutor who tempers
> zeal with human kindness, who seeks truth and not
> victims, who serves the law and not factional purposes,
> and who approaches his task with humility.

*Id.* at 20.

In referencing the need to temper zeal, Jackson was plainly
referring to the opinion of Justice Brandeis in *Olmstead v.
United States,* 277 U.S. 438, 471 (1928) (Brandeis, J.,
dissenting), a portion of which is inscribed on the wall of this
court's Boston courthouse. In a portion of that opinion not
inscribed, Brandeis warned that

> [e]xperience should teach us to be most on our guard to
> protect liberty when the government's purposes are
> beneficent. Men born to freedom are naturally alert to

> repel invasion of their liberty by evil-minded rulers.
> The greatest dangers to liberty lurk in insidious
> encroachment by men of zeal, well-meaning but without
> understanding.

*Id.* at 479.

The distinguishing feature of the instant zealous prosecution, of course, is that the defendant was herself charged with enforcing immigration law.  And while Henderson's employment of Bitencourt standing alone may have been legal and her advice not on its face reprehensible, Henderson's relationship with her cleaning lady violated norms of the agency for which she worked. But the administrative process the agency had established to enforce those norms was plainly adequate to the task of fashioning a proportionate employment-centered sanction for the misconduct at issue in this case.

Nevertheless the enduring question, *Quis constodiet ipsos custodes*? (Who will guard the guards themselves?) in the context of the politically-charged topic of immigration regulation, when coupled with voyeuristic curiosity about the domestic arrangements of public officials, has fueled a burning interest in pursuing this otherwise pedestrian matter.  John Sparrow once invoked the English essayist and historian Thomas Babington Macaulay to describe the prurient interest which the domestic arrangements of those holding public office can generate.

> We know of no spectacle so ridiculous, said Macaulay, as
> the British public in one of its periodic fits of
> "morality" and he proceeded to describe in caustic

language the national tendency to indulge an outraged and "outrageous virtue" at the expense of some unfortunate public man who has been convicted of an indiscretion that shocks its sense of decency.

John Sparrow, *The Press, Politics, and Private Life* in

CONTROVERSIAL ESSAYS 21 (1966).[10]

A sense of outrage out of proportion to the circumstances of the misconduct here has apparently driven the case to be pursued as a felony. That pursuit can give rise, as it did for one of the jurors in the case who wrote to the court after the post trial motion hearing, to the appearance of exploitation, "for publicity and political reasons," of Henderson's lack of prudence "in her hiring of a cleaning lady."[11] Under such circumstances the pursuit of modest misconduct takes on the character of a meretricious prosecution of a factitious felony.[12]

---

[10] *Citing* T. BABINGTON MACAULAY, I CRITICAL AND MISCELLANEOUS ESSAYS 392, 393 (Weeks, Jordan & Co. ed. 1863)(reviewing THOMAS MOORE, LIFE OF LORD BYRON (1854)).

[11] Shortly after I expressed concerns about this prosecution during a sentencing hearing during which the instant motions were considered, I received a highly unusual letter from one of the jurors in this matter expressing this view. That letter is found in the docket as No. 79.

[12] The potential for gratuitous, overwrought and inflammatory publicity in a prosecution such as this is well demonstrated by comments volunteered in an interview granted by the head of the Public Corruption and Special Prosecutions Unit in the United States Attorneys Office on the day Henderson was arrested. "She's supposed to be deporting aliens, not hiring them," he told the Boston Globe. Jonathan Saltzman, *New England Border Protection Chief Charged with Hiring Illegal Immigrants*, BOSTON GLOBE, Dec. 5. 2008, at A1. Conceding that "I do believe [the Globe reporter] quoted me accurately," the supervisor stated

Against the indulgence of unthinking and disproportionate outrage - perhaps well meaning but notably lacking in understanding - the counsel attributed to Thucydides is an appropriate antidote: "Of all manifestations of power, restraint impresses men most."[13]  One Shakespearean scholar has suggested

---

defensively in an affidavit I required to be filed:

> I believe this was an overly simplistic attempt on my part to explain the nature of the charge and why it was being handled by the public corruption unit, which is something that I understood the Local Rules to permit on the day of arrest.  I did not intend it to be a personal expression of my 'opinion as to the accused's guilt or innocence as to the merits of the case or the evidence in the case' as prohibited by Local Rule 83.2A.

Dkt. No. 78, Ex. 1.

Whether this explanation is plausible or pretextual, the self-serving assertion of lack of intent does not obscure the impact of the "overly simplistic" comment.  It was essentially a bumper sticker expression of the prosecutor's personal opinion as to the evidence of the defendant's guilt on the merits, fabricated to cultivate publicity for the prosecution's initiative with a sound bite that would (and did) fit neatly into the fourth paragraph of the article in the area's largest newspaper announcing the defendant's arrest.

[13] The attribution appears apocryphal.  The source generally cited by the many who have invoked Thucydides with this quotation is THE PRACTICAL COGITATOR: The Thinker's Anthology 461 (Charles P. Curtis, Jr. & Ferris Greenslet eds.) (3d ed. 1962).  The editors of THE PRACTICAL COGITATOR admit that "even with the aid of the best scholars," they "cannot find it in Thucydides." *Id.*  They, in turn, give their source "as quoted by Walter Lippmann". *Id.* In a note, the editors state that it is found "[i]n Lippman's column [on an unspecified date] in 1944," and also that "[i]t's in the preface to the Thucydides in the Loeb edition, but without reference to the text." *Id.* at 660.  My research has located the Lippmann quotation in his *Today and Tomorrow* column, published at A4 of the Los Angeles Times for January 18, 1944.  That column concerns facilitation of negotiations over the Polish-Russian

in this connection that "[e]very judge, every powerful government
official . . . –everyone who exercises power – should recite [the
following cautionary] lines before going to sleep each night:

> 'O, it is excellent
> To have a giant's strength, but it is tyrannous
> To use it like a giant.'"

DANIEL J. KORNSTEIN, KILL ALL LAWYERS? SHAKESPEARE'S LEGAL APPEAL 55 (1994)

(quoting WILLIAM SHAKESPEARE, MEASURE FOR MEASURE, act 2 sc. 2 ll. 109-
11).

In that portion of Justice Brandeis's dissent in *Olmstead*
that is inscribed on the walls of the Boston courthouse where
Henderson was tried, he reminds us that "[o]ur government is the

---

boundary dispute, and there Lippman urged "reminding the Russians
as well as ourselves of the great saying of Thucydides that 'Of
all manifestations of power, restraint impresses men most.'"  It
appears, however, that this was not a "great saying of
Thucydides" at all but rather an observation by his translator
Professor Charles Foster Smith inexplicably presented between
unattributed quotation marks in his Introduction to the Loeb
Classics translation of Thucydides. I THUCYDIDES IN FOUR VOLUMES:
HISTORY OF THE PELOPONNESIAN WAR BOOKS I AND II vii (Charles Foster Smith
trans. 1935) Moreover, the observation by Professor Smith was not
directed at the the exercise of political power but rather at the
restrained rhetorical style he found deployed by Thucydides. In
Professor Smith's words,

> [Thucydides] packs his language so full of meaning that
> at times a sentence does duty for a paragraph, a word
> for a sentence. <u>"Of all the manifestations of power,
> restraint impresses men most,"</u> and however much we
> regret his reserve, since for much that he might have
> told us we have no other witnesses, we come more and
> more to regard this as great art.

*Id*. at xviii-xix (emphasis added).

potent, the omnipresent teacher.  For good or for ill, it teaches the whole people by its example." 277 U.S. at 468. Consequently, as Justice Frankfurter observed in another quotation from an opinion inscribed on the Boston courthouse, "the responsibility of those who exercise power is not to reflect inflamed public feeling but to help form its understanding." *Cooper* v. *Aaron*, 358 U.S. 1, 26 (1958) (Frankfurter, J. concurring).

The lessons of proportionate restraint while pursuing measured judgment, in the face of unreasoning outrage, require careful calibration of the level of culpability for modest misconduct.  These are lessons often difficult to accept, master, and deliver.  Their application begins in the criminal context with the prosecutor's charging decision and, if necessary, end with such judgment as the courts are permitted to exercise.  In the absence of some greater exercise of restraint by the prosecution in this case, it is necessary to conduct a new trial to assure proper judgment by the court.

Accordingly, while denying the defendant's renewed motion for a judgment of acquittal (Dkt. No. 60), I GRANT the defendant's motion for a new trial (Dkt. No. 62).


**/s/ Douglas P. Woodlock**
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE